Per Curiam : This case was referred to Trial Commissioner George Willi under the order of reference and Rule 57(a) with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 30, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On January 22, 1968, defendant filed a motion that the court adopt the opinion, findings and conclusion of the trial commissioner. Since the court agrees with the commissioner’s findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis *278 for its judgment in this case without oral argument. Therefore, plaintiffs are not entitled to recover and the petitions are dismissed.
OPINION OP COMMISSIONER
Willi, Commissioner:
These consolidated cases, presented on a fully stipulated record, raise but one issue — the taxable base to which the ad valorem, documentary stamp levy imposed on real estate transfers by section 4361 of the Internal Revenue Code of 1954 is to be applied. The real estate involved consisted of lots improved by new prefabricated dwelling houses. The question is whether the documentary stamp tax properly attaches to the total price that the home buyer paid for the house and lot or only to the portion of that price attributable to the lot.
The facts, elaborated in the findings of fact accompanying this opinion, need only be summarized here.
The plaintiffs, referred to herein as “Raccoon” and “Brook-side Sales,” are Ohio corporations in the business of land development for residential purposes. They conducted their land operations in conjunction with three sister corporations; Brookside Builders, Inc. and Courtesy Homes, Inc., both engaged in building prefabricated homes, and Courtesy Homes Sales, Inc., exclusive sales agent for Brookside Builders and Courtesy Homes. Significantly, one individual, Mr. Byron E. Schofield, was the controlling shareholder and principal officer of all of these corporations throughout the period in suit.
Neither Raccoon nor Brookside Sales sold residential lots except in conjunction with the sale of a prefabricated house constructed by their affiliates.
Between November 1,1958 and October 31,1962, the period in issue as to both plaintiffs, Raccoon conveyed 128 lots to purchasers of prefabricated homes and Brookside Sales conveyed 683 lots to such purchasers.
Code section 4361 imposes a tax on all deeds of real estate where the value of the property involved exceeds $100. The prescribed tax rate is 55 cents for each $500 increment of value or fractional part thereof.
*279 In calculating their documentary stamp tax liability on the conveyances mentioned above, plaintiffs applied the 55-cent rate only to what they regarded as the portion of the total price paid by the home buyer that was attributable to land. Tax deficiencies and interest were assessed by the Commissioner of Internal Revenue on the theory that tax was due on the full price paid by the home buyer for his house and lot. The deficiencies and interest were duly paid and timely claims for refund were filed. After formal disallowance of the claims the instant suit followed.
In presenting the cases here the parties have agreed that all real estate transactions underlying the taxes in dispute are typified and fairly illustrated by one involving the purchase of a home from Brookside Builders by Mr. and Mrs. Leo Colborn of Gahanna, Ohio, a suburb of Columbus.
At the root of the Colborn transaction was an October 1960 agreement between Brookside Sales and Brookside Builders, both headed and controlled by Byron Schofield, under which Sales, the land development company, bound itself to fully develop the lots comprising the Royal Manor Addition at Gahanna and gave Builders the exclusive right to purchase such fully developed lots at $3,250 each. Sales agreed to convey the lots to either Builders or its nominee, whichever directed by Builders.
Homes of the type purchased by the Colborns were advertised by Builders in the Gahanna newspaper. The theme of the advertising was clearly directed to the sale of a house and lot for a single total price. In fact, the parties have stipulated (1) that none of plaintiffs’ lots were sold or offered for sale except in conjunction with the sale of a prefabricated house erected by plaintiffs’ affiliate and (2) that all interested home buyers believed that they were making a single purchase consisting of a house and lot.
The following is a chronological summary of the Colborn transaction.
On October 23, 1960, the Colborns signed an agreement with Builders to purchase a Royal Manor home for a price not to exceed $14,600 plus closing costs.
On November 30, 1960, after completion of a satisfactory investigation of their credit, the Colborns signed a so-called *280 Construction Agreement with Builders for the purchase of a specific Royal Manor lot and home to be built on it. The agreement recited a price of $11,900 for the 'house and $2,700 for the lot
On the same date, Mr. Colborn, a Navy veteran, filed an application for VA financing totalling $14,600 for the purchase of “improved realty” with no price breakdown shown as between house and lot.
On January 5, 1961, the Veterans Administration issued a loan guarantee commitment covering a $14,600 loan to the Colborns repayable over 29 years with interest at 5% percent. On the strength of this commitment National Homes Acceptance Corporation notified the 'Colborns that it would make a loan in accordance with the terms of the VA guarantee.
On January 11, 1961, plaintiff Brookside Sales executed a warranty deed conveying the sub] ect lot to the Colborns who executed an appropriate mortgage deed and note payable to National Homes Acceptance. These loan and title documents, all of which had been prepared by Builders’ lawyer, were forwarded to the Lawyers Title Insurance Corporation for recording and issuance of title insurance. Builders instructed Lawyers Title to affix $2.75 in documentary tax stamps to the Colborns’ deed. Under the rates prescribed by section 4361, $2.75 worth of stamps reflects a property value of $2,500. This assigned figure was the result of an agreement between plaintiffs and their corporate affiliates as to the value of Royal Manor lots. The discrepancy between this figure ■and the $3,250 and $2,700 figures specified in the October 1960 Land Purchase Agreement between Sales and Builders and the Colborns’ November 1960 Construction Agreement, respectively, is unexplained.
On January 20, 1961, the Colborn loan and title instruments were recorded. The warranty deed was then mailed to Builders where it was kept on file pending completion and occupancy of the Colborn house which occurred on or about May 1, 1961. At that time, after the Colborns had executed a Veterans Administration Declaration of Acceptance, the warranty deed was delivered to them by Builders. The Colborns’ first payment on the mortgage was due June 1, 1961, the closing date.
*281 The parties have stipulated that if, after plaintiffs executed a warranty deed, the 'buyer decided not to go through with the proposed home purchase, he was obliged to execute a quitclaim deed on the lot involved. Accordingly, it was impossible to acquire any of the plaintiffs’ lots except in conjunction with the purchase of a completed prefabricated house erected and sold by their construction and sales affiliates.
In denying liability for the additional taxes asserted by the Government, plaintiffs’ position rests on the formal implications of the documents and events attending the transactions in suit. Specifically, reliance is placed on the fact that the only thing deeded to the home purchaser by plaintiffs was an improved lot with no house on it at the time of recordation; which event, it is urged, fixes the incidence of the tax according to the applicable Treasury Regulation. The consideration paid for the house, plaintiffs say, should not create additional documentary stamp tax liability because the house was acquired in a transaction to which they were not a party.
Plaintiffs’ argument is deficient in both fact and law.
Neither the Treasury Regulations nor any other authority make recordation of a deed the touchstone of taxability for documentary stamp purposes. To the extent that the timing of taxability hinges on an event, it is delivery, not recordation, that is controlling. Thus, section 47.4361-1 (a) (2) of the Treasury Regulations provides: “The tax attaches at the time the deed or other instrument of conveyance is delivered, irrespective of the time when the sale is made.”
Under Ohio law recordation is at most presumptive of delivery, not determinative. Smith v. Ranck, 37 Ohio Op. 235, 80 N.E. 2d 631 (1946) ; Lemley v. Shafer, 14 Ohio App. 362 (Ct. of App., Lawrence Co., 1921). The critical factor is the intention of the parties at the time of execution and recordation. At that time did the grantor and grantee intend a present transfer of the property described in the conveyance? Kniebbe v. Wade, 161 Ohio St. 294, 297, 118 N.E. 2d 833, 835 (1954).
The stipulated[1] facts respecting quitclaim leave no doubt that in these cases a present transfer of property was not intended at the time of recordation.
*282 To attempt to isolate and segregate the acquisition of the lot and the dwelling ignores the actualities of the total situation. This may not be done. Higgins v. Smith, 308 U.S. 473, 477 (1940).
It is wholly unrealistic to overlook the fact that all corporations involved in the transactions in suit were effectively controlled by a single individual, Byron Schofield. In that capacity, he was necessarily responsible for the October 1960 Land Purchase Agreement under which the plaintiff corporations bound themselves to sell no lots in the Royal Manor Addition except as approved and directed by their home building and sales affiliates. For the same reason it must be assumed that he was responsible for the quitclaim provision that made it impossible for a third-party purchaser to acquire one of those lots except as a part of the purchase of a finished home erected and sold by Builders. These factors, without more, combine to impel the conclusion that under no circumstances could the taxable conveyance pertain only to land. Suffice to say, the various implementary loan and purchase documents, detailed in the accompanying findings of fact, are equally persuasive that interested buyers were offered homes, not lots.
It is not disputed that the documentary stamp tax due is measured by the net consideration paid for the realty conveyed where that consideration is definite in amount. In the Colborn transaction, agreed to be typical, that consideration was $14,600. They were neither offered nor did they bargain for anything other than a home, including a lot, at that price. Accordingly, the lot was in reality an inseparable part of what the Colborns bought. The lump-sum purchase price that they paid is therefore the proper measure of documentary stamp tax liability.
Applying to the facts of these cases the settled maxim that the incidence of taxation depends upon the substance of a transaction,[1] the plaintiffs cannot prevail.
Findings of Fact
1. Taxpayers, Raccoon Development, Inc. (hereinafter referred to as “Raccoon”) and Brookside Sales, Inc. (here *283 inafter referred to as “Brookside Sales”) are Ohio corporations engaged in real estate development. Brookside Builders, Inc. (hereinafter referred to as “Brookside Builders”) and Courtesy Homes, Inc. (hereinafter referred as as “Courtesy Homes”) are Ohio corporations engaged in home building. Courtesy Homes Sales, Inc. (hereinafter referred to as “Courtesy Sales”) is an Ohio corporation engaged in real estate sales. All five corporations are located in Gahanna, Ohio, a suburb of Columbus, and all except Eaccoon had as their street address 3223 Stygler Eoad, Gahanna. Eaccoon’s address was Post Office Box 4, Gahanna. Throughout the period in suit, November 1, 1958 to October 31, 1962, Mr. Byron E. Schofield was the principal officer and stockholder of all of the foregoing corporations. Brook-side Sales and Eaccoon did not construct or build National Homes during that period.
2. From November 1, 1958 to October 31, 1962, taxpayer Eaccoon made 128 conveyances of realty to individual purchasers. The question in this case is the proper amount of documentary tax stamps that should have been affixed to each deed conveying the aforementioned realty.
Findings 3 through 27 below describe the transactions under which the realty in question was conveyed. The parties have agreed that typical of all such transactions was the one involving Lot No. 313 in Eoyal Manor Addition, an addition to the Village of Gahanna, Franklin County, Ohio, which was conveyed from taxpayer Brookside Sales to Mr. and Mrs. Leo Colbom.
3. On October 22, 1960, Brookside Sales (as party of the first part) and Brookside Builders (as party of the second part) entered into a contract entitled “Land Purchase Agreement” which provided in part as follows:
It is hereby agreed that the party of the first part will fully develop the lots in Eoyal Manor Addition, Ga-hanna, Franklin County, Ohio and will sell the fully developed lots to the party of the second part for the sum of $3250.00 for each fully developed lot.
In consideration of the payment of the above sum by party of the second part to party of the first part for *284 each, fully developed lot, it is agreed mutually as follows:
A. The lots shall be conveyed by Warranty Deed directly from party of First Part to party of the Second Part, or to such person or persons as shall be named by party of the Second1 Part.
B. Party of the Second' Part shall have the exclusive right to purchase the above described lots and said First Party shall not convey any of the lots to third parties or other parties without the written permission or verbal direction of the party of the Second Part.
C. Payment for the lots shall be made at the time of the delivery of the deed, unless by mutual agreement the time of payment is set earlier or later at the convenience of the parties hereto.
4. Shortly prior to the “Land Purchase Agreement,” referred to above, an application was submitted to and a commitment for insurance issued by the Federal Housing Administration to insure a loan in the amount of $14,250 for Lot No. 313, and a National prefabricated home to be built thereon by Brookside Builders. The insurance commitment specified $2,900 as the estimated market price of a site equivalent to Lot No. 313. The commitment was issued to the proposed mortgagee, National Homes Acceptance Corporation, Lafayette, Indiana.
5. Individual purchasers of the properties in question, such as the Colborns, would come to the office of Brookside Builders or Courtesy Homes and be shown models of the various styles of National Homes. They would select a lot and designate the style or type of National Home they desired to be built on the lot selected. At that time, they would enter into an agreement with Brookside Builders or Courtesy Homes for the purchase of the house and lot selected. The agreement between Brookside Builders and the Colborns with respect to Lot No. 313 states as follows:
AGREEMENT TO PURCHASE
This agreement entered into this 23 day of Oct 1960 between Leo W. Colborn hereinafter called purchaser *285 and Brookside Builders Inc, hereinafter called the seller witnesseth:
The purchaser hereby deposits with the seller the sum of $5.00 which is to be considered as a deposit on Lot Number 313 in Royal Manor, Ohio. The seller agrees to hold this deposit in Trust and to take all necessary steps to qualify the purchaser as a buyer of a Victorian #23 National Home to be built on said lot. The total contract price of the house and lot not to exceed $14,600.00, plus loan closing costs.
When the F.H.A. or V.A. appraisals are completed, the seller agrees to try to qualify the purchaser for a F.H.A. or V.A. approved loan. Should the seller be unable to secure the purchaser of a F.H.A. or V.A. approved loan, said deposit herein made, less any F.H.A. or V.A. authorized expenses, incurred on behalf of the purchaser shall be refunded to the purchaser by the seller.
Should the purchaser refuse to proceed with the purchase of the home though the purchaser be qualified, the deposit may be forfeited and the seller may retain same as damages.
Said deposit herein made by the purchaser is to be applied toward the purchase price and the loan closing costs, if applicable.
Seller: Purchaser :
Beookside Builders, Inc.
By: Courtesy Home Sales, Inc. Their Exclusive Sales Agent /s/ Leo W. Colborn Husband
By: [signed] /s/ Rita A. Colborn Wife
Sales Manager Title 184 East 7th Ave Address
AX 9-6196 Phone Number
*****
6. After the prospective purchasers’ credit had been checked and verified, they would enter into a contract entitled “Construction Agreement” with Brookside Builders *286 or Courtesy Homes. Tbe “Construction Agreement” between the Colborns and Brookside Builders provided in part as follows:
construction agreement
This Agreement is made this 80th day of November, 1960, between Brookside Builders, Inc, of Gahanna, Ohio, herein called Builder, and Leo Webster and Rita A. Colbom, h/w, of Columbus, Ohio herein called Owner.
*1. Real estate. The Builder agrees to sell and the Owner agrees to purchase the following described real estate in Franklin County, State of Ohio, to wit: Lot No. 318 in Royal Manor Addition, an addition to the Village of Gahanna, Franklin County, Ohio. 568 King George Aye., Gahanna, Ohio
The Builder shall furnish an abstract of title therefor currently certified, showing a merchantable or insurable title in the Builder, or an owners policy of title insurance, subject to the lien of current taxes and restrictions and easements of record, and shall convey the same by warranty deed to the Owner. All taxes and assessments which have become a lien upon the land at the date of closing shall be paid by the Builder excepting : Current real estate taxes to be pro-rated as of date of closing;_
2. Construction oe house. The Builder agrees to construct on the real estate described in Paragraph 1, if applicable, and if not applicable, on the following described real estate in___, State of — , — , to wit: the house manufactured by National Homes Corporation and known as the Sunwood 886 Plan, Design 23, in accordance with the plans and specifications attached hereto, made a part hereof and initialed by the parties. The Builder further agrees to make such sewer and water connections and to construct such other structures, walks and drives, and do such finish grading as may be provided in said plans and specifications, or elsewhere herein. Where a construction loan is made in the *287 name of tbe Owner, tlie Builder agrees to convey title to the above described real estate to Owner prior to the commencement of construction.
The Builder shall furnish all labor and materials and do all things required by said plans and specifications and listed in Paragraph 3 below. The Owner declares that he has read said plans and specifications and that all changes or additions to the basic house described therein and all additional materials, fixtures, appliances, equipment, facilities and all other obligations required of the Builder are listed in Paragraph 3 below.
3. PURCHASE price. The Owner agrees to pay the Builder for the real estate (if applicable) and the house the sum of the following amounts:
Real Estate (if applicable) Lot 313 $2, 700. 00
Basic House, as shown on Plans and Specifications Design #23 11,900.00
Additions to or changes in Plans and Specifications and additional materials, fixtures, appliances, equipment and all other obligations of Builder_ _
GA. 119964
Total Purchase Price 14, 600. 00
The total purchase price shall be paid as follows:
Earnest money in cash, receipt of which the Builder acknowledges 0
Additional cash to be paid, as follows:__
Proceeds of construction loan (if applicable) 14, 600. 00
Loan closing costs in the amount of $301.03 to be paid by Owner (or, paid and receipt hereby acknowledged).
If the suppliers’ prices to the Builder for the basic house or other materials or work are increased prior to delivery thereof to Builder, the Builder may elect to add such increase to the total purchase price. The Owner may accept any such increase in writing or terminate this agreement in writing within seven days after notification of the increase and be refunded the down payment.
Note: If constructon financing is not to be in name of Owner, strike out Paragraph 4. If loan disburse *288 ments are not as printed, insert alternate method used and strike out inapplicable method.
4. Financing. The Owner agrees promptly to apply for a construction loan, secured by mortgage or deed of trust, to an approved lending institution in the amount of $14,600.00. The proceeds of said construction loan shall be disbursed as follows: 50% upon completion of foundation and house erected and under roof; 20% when partitions are in place, and plumbing, wiring and heating are roughed in and house is ready for the trimming out and receipt by lender of an approved second FHA. and/or VA Compliance Inspection Beport; balance of proceeds when house is complete and final approval received from FHA and/or VA; or, as follows:-_Interest on the construction loan is to be paid by the Builder up to completion of construction. If a written commitment for such a loan or for such other amount, and with such maturity and repayment provisions as will enable the Owner to pay the total purchase price and to retire the obligation is not obtained by the Owner on or before 90 days, this agreement may be terminated by either party upon notice in writing delivered to the other party. If the agreement is so terminated, the down payment shall be returned to the Owner.
5. Statement oe appkaisal. If the Owner intends to finance this transaction by a mortgage loan insured by FHA, it is expressly agreed that, notwithstanding any other provisions of this agreement, the Owner shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money or down payment deposit or otherwise unless the Builder has delivered to the Owner a written statement issued by the Federal Housing Commission setting forth the appraised value of the property for mortgage insurance purposes of not less than $_, which statement the Builder hereby agrees to deliver to the Owner promptly after such appraised value statement is made available to the Builder.
*289 6. Advances eoe account oe owner. In any case where the Builder is obligated to refund the down payment made by the Owner he may retain therefrom ■any amounts advanced and paid by him for the Owner’s account in connection with the transaction or financing thereof such as, customary out of pocket expenses and all other similar fees and costs approved by the Federal Housing Administration and/or Veterans Administration (herein called FHA and VA, respectively).
7. Insurance. The Builder agrees to carry Workmen’s Compensation insurance, liability insurance with limits of not less than $5,000 for property damage, and not less than $10,000 for one person and $20,000 for more than one person for personal injuries or death. Fire and Extended Coverage insurance shall be furnished and paid for by Owner to protect the property until occupied by the Owner, in the amount of $11,900.00.
8. Completion and delivery oe possession. The Builder agrees to complete the house by 240 days after VA approval, subject, however, to any causes beyond the control of the Builder, which may prevent or delay such completion, including without limitation any of the following: strikes, riots, labor disputes, war, availability of materials, governmental rulings or regulations, Acts of God, issuance of valid building permits, compliance with all applicable building, zoning and planning laws, ordinances, regulations or orders, and litigation, or threatened litigation, pertaining to any of the foregoing.
The Owner shall not be entitled to possession of the house and shall not move any goods or materials into the house until (a) the house has been completed and final approval received from FHA and/or VA, if applicable, and (b) the house has been accepted by the Owner and (c) the total purchase price has been paid in full.
9. Builder’s warranty satiseaotory to FHA or VA. If the Owner intends to finance this transaction by a mortage loan insured or guaranteed by FHA or VA, the Builder agrees to deliver to the Owner, at the time *290 and in tlie form required by the Federal Housing Commissioner or the Administrator of Veterans Affairs, a written warranty that the dwelling herein-above referred to is constructed in substantial conformity with the plans and specifications (including any amendments thereof, or changes or variations therein, which have been approved in writing by the Federal Housing Commissioner or the Administrator of Veterans Affairs) on which the valuation of said dwelling was 'based; provided, however, that such warranty shall apply only with respect to such instances of substantial non-conformity to such approved plans and specifications (including any approved amendments, changes or variations) as to which the Owner gives written notice to the Builder within one year from the date of conveyance of title to, or initial occupancy of, the dwelling whichever occurs first.
10. Entiee ageeement: No representations or warranties, express or implied, are made or agreed to be made by either party hereto, except those specifically provided herein. All prior negotiations, statements, representations, warranties and agreements, if any, pertaining to any or all of the details of this transaction are hereby superseded and terminated by this agreement, which constitutes the entire agreement of the parties.
It is agreed and understood that the Builder makes this agreement independently of and not as an agent or employee of the Home Manufacturer referred to in paragraph number 2 above, and the Owner acknowledges and declares that no agreements, representations, or warranties, express or implied, relating to this transaction, have been made by the Home Manufacturer.
The cost of any alterations, additions, omissions or deviations from the plans and specifications shall be added to or deducted from the Total Purchase Price. No changes or amendments to this agreement shall be effective unless made in writing and signed by the parties hereto.
*291 This agreement shall inure to the benefit of and be binding upon the heirs, devisees, personal representatives, successors and assigns of the parties hereto.
Executed the day and year first above written.
BROOKSIDE BUILDERS, InO. (Builder) /s/ Leo Webster Col-born_ Husband
By Courtesy Home Sales, Inc. (their exclusive sales agent) /s/ Rita A. Colbom Wife
By_ Frank T. Baldy, Vice President for Sales Witness
Witness
Where FHA rather than VA financing was used, the same form of Construction Agreement was used except that “Section 3” was filled out as follows:
3. Purchase price. The Owner agrees to pay the Builder for the real estate (if applicable) and the house the sum of the following amounts:
Real Estate (if applicable) Per PHA Approval $14, 905.00
Basic House, as -shown -on Plans and Specifications _
Additions to or changes in Plans -and 'Specifications and additional materials, fixtures, ■appliances, equipment -and all other obligations of Builder _
The -builder agrees to pay $120.00 closing costs over and above the sales price of $14,905.00 Total Purchase Price $14,905. 00
The total purchase price ($14,905) was entered in the blank space in paragraph 5 “statement op appraisal.”
7. Although the lots were owned by taxpayers, the individual purchasers of the properties in question considered that they were buying a house, including a lot, at one total price, from either Brookside Builders or Courtesy Homes. The individual purchasers conducted no separate negotiations with taxpayers or Brookside Builders or Courtesy Homes as to the price of the lot.
*292 8. The advertising carried on with respect to the sales in question advertised a house and lot at one total price.
9. All lots sold by taxpayers were in transactions similar to the Colborn transaction. Taxpayers’ improved lots were not sold to individual purchasers, except under Construction Agreement contracts, as described above.
10. On November SO, 1960, the same date as the Construction Agreement, Mr. Colborn executed an application to the Veterans Administration for a home loan guaranty of a loan in the amount of $14,600 for the purpose of constructing a home. This application required a certification that the statements therein were, to the best of the signers’ knowledge, true and complete, and the face of the application refers to Federal statutes providing severe penalties for intentional misrepresentations. The application was also required to be executed by the lending institution. Under a section entitled “Estimate of Total Cost” this application shows as follows:
1. Purchase of Improved. Realty_ $14,600. 00
2. ‘Construction:
Cost of Improvements_ 0
Unpaid Balance on Land_ 0
Total_ O
3. Repairs, Alterations or Improvements (existing dwelling unit)_ ©
4. Refinance Delinquent Indebtedness_ O
5. Refinance Unpaid Balance of Land 'Sale Contract— O
6. Total (Items 1 through 5)_ 14,600. 00
7. Closing'Costs (Total)_ 264.75
8. (Prepaid Items (Insurance)_ 36.28'
9.Total Cost to Veteran_ 14, 901.03
10.Less Cash from Veteran_ 301. 03
11.Amount of Loan_ 14,600. 00
Item 12 of the same section of the application states: “If Land Acquired by Separate Transaction Fill In 12A and 12B.” Spaces “12A” and “12B” are blank in the Colborn application.
11. On December 15, 19.60, National Homes Acceptance Corporation forwarded to the Veterans Administration Mr. *293 Colborn’s application for a loan guaranty, along with a credit report, the construction agreement, verification of employment form and certain other documents, and requested that a certificate of commitment be issued as early as possible. On J anuary 5,1961, the certificate of commitment was issued by the Veterans Administration to National Homes Acceptance Corporation 'for a loan in the amount of $14,600.
12. On January 9,1961, National Homes Acceptance Corporation sent a letter to the Colboms, in care of Brookside Builders, stating that it had received a commitment from the VA in the amount of $14,600 and had agreed to make a loan to the Colborns in the amount of $14,600 for a term of 29 years at an interest rate of 514 percent to be repaid in monthly installments of $81.78 beginning on June 1, 1961. This letter states that the total property price is $14,600, the VA loan $14,600, and the down payment zero. The letter also sets forth certain conditions which were required to be accepted by the Colborns prior to making the loan, including the assignment of the loan proceeds to National Homes Corporation and Brookside Builders and the execution of a note and mortgage deed and the recording of the latter. The Colborns accepted the conditions set forth in this letter on January 12, 1961.
13. On January 11,1961, a warranty deed was executed by Brookside Sales with respect to Lot No. 313 naming the Colboms as grantees. The deed recites the consideration as $10 and other good and valuable consideration. Federal documentary tax stamps in the amount of $2.75 were affixed to this deed.
14. On January 12,1961, the Colboms executed a mortgage deed with respect to Lot No. 313 naming National Homes Acceptance Corporation as the mortgagee. The consideration stated in this deed is the sum of $14,600. Contained in the mortgage deed is the following statement:
Grantor covenants that at and until the execution and delivery of these presents, he is well seized of the above-described premises in fee simple (or such other estate, if any, as is stated herein) has good right to bargain and sell the same in manner and form above written, *294 tbat tbe same are free from all encumbrances whatsoever except as herein otherwise recited; * * *.
On January 12,1961, the Colboms also executed a mortgage note in the face amount of $14,600, with interest thereon at 514 percent, payable to National Homes Acceptance Corporation, said amount to be repaid in installments of $81.78 per month, commencing on the first day of June 1961, with the final installment due on the first day of May 1990.
15. The warranty deed, mortgage deed and mortgage note were prepared by the attorney for Brookside Builders or Courtesy Homes. Said attorney delivered the warranty deed and the mortgage deed to Lawyers Title Insurance Corporation, which company would deliver the warranty deed and the mortgage deed to the Franklin County recorder for recording.
16. Lawyers Title Insurance Corporation affixed the documentary tax stamps to the deed and billed either Brookside Builders or Courtesy Homes for the cost of the documentary tax stamps. At the time of the Colborn transaction, Lawyers Title Insurance Corporation was under instructions from Brookside Builders to affix documentary tax stamps in the amount of $2.75 to each deed because the value of each lot transferred was considered by Brookside Builders, Courtesy Homes and taxpayers to be $2,500.
17. The warranty deed and the mortgage deed were recorded on January 20, 1961, in the Colborn transaction. Except as they may have been advised by the documents they executed, individual purchasers were generally not aware and were not concerned with the fact that the warranty deed was executed and recorded at this time and were generally of the opinion that they were not entitled to the property until such time as they could move in and occupy it, which was after the National Home had been constructed and the construction approved by either the Veterans Administration or the Federal Housing Authority. The Construction Agreement also stated that purchasers were not entitled to possession of the property until completion of construction.
*295 18. After recording, the deeds were mailed to Brookside Builders or Courtesy Homes. Brookside Builders or Courtesy Homes retained the recorded deeds in their files. The deeds were generally given to the individual purchasers when they received possession of the house. In other cases, the deeds were mailed to the individual purchasers by Brook-side Builders or Courtesy Homes after the individual had taken possession of the house. A letter mailing such a deed states as follows:
Dear Mr. and Mrs. Bailey:
Enclosed please find the Warranty Deed to your property at 310 Laurel Court, Sunbury, Ohio.
Please note this document has been recorded and is now your evidence of ownership. Keep this Warranty Deed with your other valuable and important papers.
Sincerely yours,
Bkookside Builders, Inc.
Some deeds were never given to the individual purchasers and remained in the files of Brookside Builders, Inc. or Courtesy Homes. Mr. and Mrs. Colburn received their warranty deed on or about May 1, 1961, when they took possession of their home.
19. If an individual purchaser decided not to go through with the transaction after the deed had been recorded, he was required to execute a quitclaim deed on the lot in question.
20. On February 1, 1961, the Lawyers Title Insurance Corporation issued to the National Homes Acceptance Corporation a document entitled “Interim Title Insurance Binder” with respect to Lot No. 313. This document states in part as follows:
lawxers title insurance corporation, herein called the Company, hereby insures:
That the title to the land described in Schedule A hereof, was on January 20, 1961, at 10:00 o’clock A.M., vested in fee simple in
LEO WEBSTER COLBORN AND RITA A. COLBORN subject only to the defects, objections, liens and encumbrances, as shown in Schedule B hereof.
*296 That upon compliance with and/or satisfaction of the requirements set forth under Section 1 of Schedule B of this Binder, and upon payment of its premium for title insurance, this Company will issue to you, as the insured, its policy of title insurance, on the usual form, in the sum of $14,600.00, showing under Schedule B thereof only such exceptions as appear in Section 2, of Schedule B of this Binder, provided no liens, encumbrances, or objections intervene between the aforesaid date and the date the instrument creating the estate or interest to be insured is filed for record, or if any liens, encumbrances or objections intervene, provided same are satisfied and/or removed.
* * * * *
Schedule B
Section 1. Showing requirements to be complied with, defects and objections to be removed or eliminated, and liens and encumbrances to be satisfied and discharged of record before policy of title insurance will be issued without exception thereto.
Hi ❖ sfs # Jfe
Item 4: Completion of improvements, acceptance thereof by the owner and receipt of affidavits satisfactory to this company executed pursuant to 1311.04 Ohio Eevised Code.
21. Sometime between February 1 and 6, 1961, Brookside Builders sent a letter to National Homes Acceptance Corporation stating in part as follows:
Gentlemen:
This letter will acknowledge the receipt of a copy of the FHA or/VA Commitment, contractor’s affidavit, and the NHAC letter of commitment to the mortgagors. In this connection, we are submitting necessary documents herewith for approval.
PLEASE CHECK ONE OP THE FOLLOWING!
(x) WE WANT CONSTRUCTION ADVANCES.
( ) WE DO NOT WANT CONSTRUCTION ADVANCES.
‡ ‡ ‡ $
In consideration of the National Homes Acceptance Corporation approving the captioned loan, we hereby *297 assume the responsibility for the mortgagors making payments which have become due on or before date of final disbursement and we hereby authorize the National Homes Acceptance Corporation to withhold such payments from any funds due at the time of such final disbursement.
Dealer Brookside BtjxldeRS, Ino.
By /s/ Byron E. Schofield
Byron E. Schofield
Title President_
City and State Gahanna, Ohio
Date — _
The date of this letter is determined to be between February 1, 1961 and February 6, 1961, since the Interim Title Insurance Binder which was included with the letter was issued on February 1,1961, and the receipt of this letter and the accompanying documents was acknowledged on February 6,1961.
Also included with the foregoing letter was a document entitled “Contractors Affidavit” which was executed by Brookside Builders on January 12, 1961, and states in part as follows:
Byron E. Schofield, being duly sworn, deposes and says that he makes this affidavit, in and on behalf of bsooKSide builders, inc., the original contractor for the erection of the building situated on the following described property, situated in the Village of Gahanna, County of Franklin, State of Ohio. Described as follows: to-wit: Lot No. 313 in Royal Manor, Gahanna, Franklin County, Ohio. That the following is a statement of the number and names of every contractor, subcontractor in the service of brookside builders, ino., in connection with said erection and of every person or firm furnishing labor and materials; therefore that the amounts due or to become due to such sub-contractors and material men are correct and fully set forth opposite their names, respectively, in said statement, to-wit:
* * ❖ ❖ *
Affiant further states that the foregoing statement is made from personal knowledge and for the purpose of *298 inducing National Homes Acceptance Corporation to disburse to the affiant the Mortgage Loan Proceeds in •the amount of fourteen thousand six hpndRed and no/100 ($14,600.00). Further the affiant saith not.
22. On February 6, 1961, National Homes Acceptance Corporation advised Brookside Builders that the documents for the loan had been approved. On March 15,1961, Brook-side Builders ordered from National Homes Corporation the prefabricated home called for in the Construction Agreement. The delivery date was April 5, 1961. In the Colbom transaction, the initial excavation for the house preparatory to the pouring of footings had been done at the time of the first Veterans Administration inspection of the property on January 13,1961.
23. On April 29, 1961, Brookside Builders executed a document entitled “Warranty Of Completion Of Construction In Substantial Conformity With Approved Plans And Specifications” and the Colborns acknowledged receipt of this warranty on April 29,1961. On April 29,1961, the Col-borns also executed a document entitled “Veterans Administration Declaration of Acceptance.” This document provided in part as follows:
I-we hereby declare that, in the Company of Brook-side Builders, Inc., the builder or his accredited representative, I-we inspected the residential property at the above address on April 29, 1961 and that without any reservations, I-we hereby accept the property as to condition of the house, other improvements, fixtures, and equipment; decoration; suitability and readiness for use as my home, which I am purchasing or intend to purchase with a loan guaranteed or insured by the Veterans Administration.
24. On May 1, 1961, Brookside Builders received a letter from National Homes Acceptance Corporation informing them that it would be in a position to make a final disbursement upon the receipt of certain documents. These documents were forwarded to National Homes Acceptance Corporation on May 3,1961. On May 5,1961, National Homes Acceptance *299 Corporation issued a final loan statement. This statement showed the total amount of the loan, $14,600, and the amounts disbursed therefrom to May 5,1961, which were as follows:
Date Amount
Construction advances:
Slab advance_ 3-30-61 $1,460.00
First advance_ 4-6-61 6, 278. OO
Dealers Loan discount- - 1, 022. 00
Second advance_ 4-15-61 2,190. 00
Land Development advance_ 5-5-61 2, 200. 00
Interest on Construction advances from date disbursed to 5-5-61_ _ 51. 31
Hazard insurance premiums to 6-1-62_ _ 38. 83
Binder fee- - 3. 00
Funds escrowed by VA for items to be completed by S — 30—61- - 600. 00
Accrued Escrow charges transferred to mortgagors escrow account_ _ 1. 00
Total funds disbursed to 5-5-61_ _ 13, 844.14
Balance payable to Brookside Builders_ _ 755. 86
Total- - 14, 600. 00
The Colborn statement shows a refund of $8.47 mortgage interest “refunded to veteran.” This amount appears to represent four days’ interest on $14,600 at 5% percent, and appears to be accounted for by the fact that the final settlement is dated May 5th and that a full payment on the property including 1 month’s interest, was due from Colborn on June 1st. Interest on construction advances was charged from the date disbursed to May 5th. In some instances, individual purchasers paid this refund over to Brookside Builders or Courtesy Homes, apparently because they received possession of the house prior to the date of the statement. This arrangement was in accordance with the terms of the Construction Agreement to the effect that interest on the loan was to be carried by Brookside Builders up to the time the purchaser was given possession of the house.
25. On May 23, 1961, Lawyers Title Insurance Corporation issued a permanent title insurance policy effective May 18,1961.
2fi. On June 1, 1961, a document entitled “Sales Closing-Statement” was prepared. This document shows that the sales price of the property was $14,600, closing costs $301.03, and the total sales price $14,901.03. The statement shows that this amount was satisfied by a mortgage for $14,600, payment by *300 Colborn of $5 on October 26,1960, $197.03 on March 7,1961, and a $100 credit on range that Colborn apparently did not take.
27. Taxpayers’ books and records reflected a sales price of each lot sold and the costs and income on each lot sold. The books and records of Brookside Builders and Courtesy Homes reflected the sales price of each National Home sold and the costs and income on each National Home constructed and sold. At some point in the Colborn transaction an amount, which is not clearly shown by the record, was apparently paid over from Brookside Builders to Brookside Sales out of the loan proceeds representing a price for the lot. The price of the lot is listed as $3,250 in the Land Purchase Agreement, $2,700 in the Construction Agreement, and that Builders received $2,200 out of the loan proceeds as a “Land Development Advance.”
28. Documentary tax stamps in the amount of $2.75 to $3.85 were affixed to each of the deeds involved. These amounts were based on an arbitrary value ($2,500 in the Colborn transaction) assumed to be the value of the vacant lots. It does not appear that this value was necessarily the same as either the price of the lot set forth in the Land Purchase Agreement between taxpayers and the building corporations or in the Construction Agreement between the building corporations and the ultimate purchasers of the properties.
29. Upon audit of taxpayers’ conveyances, the Commissioner of Internal Revenue took the position that documentary tax stamps should have been affixed to each deed in an amount representing the full price of each house and lot, and asserted additional documentary stamp tax liability of $1,377.50 on taxpayer Raccoon’s 128 conveyances and $8,323.85 on taxpayer Brookside Sales’ 683 conveyances.
30. On November 26,1962, taxpayer Raccoon paid $1,377.50 to the Director of Internal Revenue, Cincinnati, Ohio, and on March 13, 1963, paid $285.56 to the Director of Internal Revenue. The latter amount represented assessed interest.
31. On or about May 1,1963, taxpayer Raccoon duly filed with the District Director of Internal Revenue, Cincinnati, Ohio, in proper form, a claim for refund of the aforesaid documentary stamp taxes and interest paid for the period Novem *301 ber 1, 1958 to October 31, 1962, in the amount of $1,663.06, pins interest as required by law. By statutory notice dated August 5, 1963, the District Director of Internal Revenue, Cincinnati, Obio, formally disallowed taxpayer Raccoon’s claim for refund.
32. On November 26, 1962, taxpayer Brookside Sales paid $8,328.85 to the District Director of Internal Revenue, Cincinnati, Ohio, and on March 13, 1963, Brookside Sales paid $417.23 to the District Director of Internal Revenue. The latter amount represented assessed interest.
33. On or about May 1, 1963, Brookside Sales duly filed with the District Director of Internal Revenue, Cincinnati, Ohio, in proper form, a claim for refund of the aforesaid documentary stamp taxes and interest paid for the period November 1, 1958 to October 31, 1962, in the amount of $8,806.08, plus interest as required by law. By statutory notice dated October 11, 1963, the District Director of Internal Revenue, Cincinnati, Ohio, formally disallowed Brookside Sales’ claim for refund of documentary stamp taxes.
CONCLUSION OK Law
Upon the foregoing findings of fact and opinion which are made a part of the judgment herein, the court concludes as a matter of law that the documentary stamp tax liability was properly assessed on taxpayers’ conveyances based on the full consideration paid for those conveyances. The petitions in these consolidated cases are therefore dismissed.

 Comm’r v. Court Holding Co., 324 U.S. 331, 334 (1945).

 This Paragraph 1 shall not apply if the Builder does not own the real estate on which the house, referred to below, is to be constructed.